Go ahead, counsel. Mr. Southwick. Good afternoon, your honors. This is Paul Southwick on behalf of the appellants, Joanna Maxson and Nathan Britson. I do intend to reserve about three minutes for rebuttal. This case is primarily about interpreting the language of a nondiscrimination statute that was designed to remedy and prevent sex discrimination at all educational institutions receiving federal financial assistance. We're talking about Title IX. Title IX, according to Supreme Court and Jackson decision, its coverage is broad. The purpose of the statute is to avoid federal funding of sex discrimination. So its coverage is meant to be interpreted as broadly as possible. On the flip side, while the statute contains some exemptions, those exemptions are meant to be interpreted narrowly. In this case, we are dealing primarily with the religious exemption and its associated implementing regulations. And those two should be interpreted narrowly in order to affect the broad remedial purposes of Title IX. Now, the first thing to do when looking at the statute is to do a plain text analysis. And the statute itself says educational institutions of religious organizations with contrary tenants. That's the heading. And it says this section shall not apply to an educational institution which is controlled by a religious organization. If the application of this subsection would not be consistent with the religious tenants of such organization. Let me ask you, do you you're not contesting that the Board of Trustees is is religious in character, are you? No, we're not contesting that the Board of Trustees is religious in character or that Fuller Theological Seminary is religious in character. So just parsing the language of the statute, you're conceding that Fuller is is in fact an educational institution. It's controlled by the Board of Trustees. You don't dispute that. You don't dispute that the Board of Trustees is religious in character. You just say that the Board of Trustees is not, quote unquote, an organization. That's really what this comes down to from a parsing of the text matter. Is that correct? That's mostly correct, except it's not an organization in the sense in which that term is used when the statute, the specific provision is read. So out of context, a board might be considered an organization. But when you're looking at the way that the statute is written, where it discusses an educational institution controlled by a religious organization, then the plain grammatical reading of that is that you're dealing with two separate entities here. And when you look at the implementing regulations and even the Singleton memo, which is relied heavily upon by by Fuller, even the Singleton memo, when you read through, it discusses that the Board of Trustees cannot itself be the religious organization. Otherwise, it would essentially, you know, have one entity involved in the Singleton memo. I don't understand why that's the case. Let's say that the Board of Trustees was composed of. I mean, I grant you that it's not there's not a single, you know, you know, religion that's represented, per se. But let's just say that the Board of Trustees is composed of, you know, the leading religious figures in the country, 10 of the most prominent theologians or something. You know, it's clearly religious in character. You would say that it's not separate enough from the educational institution because because why? Let's say that none of the 10 leading theologians that compose the Board of Trustees is a member of the faculty, has any other day to day teaching responsibilities or just outside folks. That would still not qualify or it would, in your view. It doesn't qualify because the board is not separate from the educational institution itself. The educational institution has a number of components, including including a board, an administration, faculty members, different schools within the educational institution. So the Board of Trustees is a part of the educational institution itself. It's not it's not somehow separate or controlling. And the language of the Singleton memo that I think is most instructive here is it's it says one of the ways to determine whether an educational institution is controlled by a religious organization is whether the members of its governing body. So the Board of Trustees are appointed by the religious organization. Again, signaling that what Congress understood was that we are dealing with an educational institution controlled by an outside religious organization. Any other kind of interpretation would essentially mean that the educational institution itself would decide what its religious tenants are, whether application of those religious tenants would conflict with religious belief, and it would essentially eliminate the reference to a religious organization. Could I could I bring you to the merits of your claim? So it seems like you have two kind of different discrimination theories. One is that same sex marriages are treated differently than non same sex marriages. The other one seems to be that there's this sexual standards policy and you can violate it in a variety of ways. And students who have premarital heterosexual sex are violating the policy but are not just discharged from the school the same way as people who violate the same policy with a same sex marriage. On that ladder theory, do you actually have an allegation that the school knows about the premarital sex? The school knows that other students are having premarital sex and are not punishing them. I think that the closest that we have, Your Honor, is that it's it's assumed in the allegation that we do have an allegation. I believe it's in the excerpt of record. I think it's paragraph two. Yeah, sorry. There are there are different disciplinary actions that are taken towards heterosexual students who violate sexual conduct than there are with respect to students in same sex marriages. Now, to the extent that that would need to be clarified or any further allegations would be necessary. That supports one of the other arguments that should be dispositive of this appeal is that the plaintiffs were denied any opportunity to amend their complaint in order to state any additional allegations regarding either the governance structure or control or religious beliefs. But it seems like on page 19 of your reply brief, it seems like you acknowledge that discovery is necessary to determine whether these allegations are true as to the disparate treatment within the sexual conduct policy. If you're admitting that you don't have more allegations, then at least as to that version of the claim, what would be the point of giving you a chance to amend it? Oh, to amend it, to make the allegation that students who are who commit sexual conduct violations of a heterosexual nature are not subjected to the extreme punishment of essentially immediate expulsion. But you already alleged that. Can you allege that the university had knowledge of violations of the sexual conduct policy but didn't act? I believe that we could, Your Honor. But that is also something that I would need to verify with my clients. Because I understood your reply brief to say you would need discovery to be able to figure out whether there was knowledge. Maybe I misunderstood what you were getting at. Yeah, I think the, you know, when you're doing a complaint, you know, inferences are meant to be drawn in favor of the plaintiff. And so I would say that in that context, the inferences could be drawn in favor and then there would be discovery to show that. What I can say is that there's no, you know, a lot of people have sex and there have been no expulsions that our clients have been aware of for heterosexual students who are violating. Also, there are a variety of rules around divorce and other types of conduct that would be at play. And, you know, what we would want to see from the administration is that our, you know, our clients are being subjected to the same kind of disciplinary procedures that a heterosexual student was. And that's the kind of discovery that we would seek and that would be relevant to that issue. And in terms of the legal basis for looking at beyond the policy itself, but looking at the implementation of the policy. And when there's an allegation that the policy has been implemented in a discriminatory manner, that is where discovery is particularly useful. And that's the Corinthian College's case before this court. And so that alone would be sufficient to remand to the district court for discovery on those issues. But beyond that, plaintiffs have also alleged. So it seems like that theory is essentially it's you have one policy about sexual misconduct and you're not enforcing it evenly. So it's a disparate enforcement theory. If the school came back and said, OK, we wrote all of this in one policy, but really we think same sex marriage is a more serious violation than the other things. Would you just be done then? I mean, let's assume that they're an organization that counts. Well, we would have to know whether or not that is Fuller's theological beliefs. And at this point, we we don't have that kind of statement. And there is no statement that in any of the materials that have been submitted with the motion to dismiss briefing, indicating that homosexuality or homosexual sex is somehow more more offensive to the religious beliefs of Fuller Theological Seminary or particularly its board of trustees. If that is indeed the controlling organization. And we can't we can't assume that from the the conduct practice that you're describing of this disparate enforcement. No, I don't think we can, because, again, at the pleading stage, you know, inferences are meant to be construed in favor of the plaintiffs, not in favor of the defendants. And so I don't think that it would comport with the rules to make that inference. If they if they rewrote their policy to make clear that their levels of violation and and same sex marriage was more religiously offensive to them than these other things, would your clients still have a damages claim like going forward? They might be able to fix this. But is your argument they needed to write the policy that way originally? Yeah, our argument is that they should have been treated fairly according to the policies that were in existence at the time. And the policies that were in existence do not indicate that Fuller has any sort of stronger or harsher beliefs about what they what they call explicit forms of homosexual conduct, as opposed to other extra marital conduct. Moreover, one of our allegations in the complaint is that while Fuller has a belief statement about marriage, its code of conduct policies don't prohibit same sex marriages. There is no prohibition on it. The only prohibition is on explicit forms of homosexual conduct. And Joanna and Nathan were never asked whether or not they engaged in explicit forms of homosexual conduct, or whether in order to stay at Fuller, they would be willing to refrain, refrain from homosexual forms of explicit sexual conduct until they completed their studies. And so those are the kinds of issues that I think would be relevant to an analysis of whether or not the policies of Fuller were being applied in a fair manner or in a discriminatory manner towards Joanna and Nathan. Do you want to save some time for rebuttal? Yes, thank you. Okay. Let's hear from Fuller. Thank you, Your Honor. May it please the court. My name is Daniel Blomberg. I represent Fuller Theological Seminary and the individual defendants of this action. Affirming Judge Marshall's dismissal is a simple matter of statutory interpretation and agency deference. Reversing her requires ignoring the best reading of the statute's text, rejecting 40 years of uniform education department interpretation, entangling the federal government in matters of internal religious polity, and undermining statutory protection for seminaries nationwide. And it would do that all in the service of the statutory interpretation that the plaintiffs have now admitted to this court as constitutionally infirm. To take the first point that Judge Watford raised earlier, the only real dispute on the statutory text as it regards an eligible organization goes to the term organization. And the district court, like the Department of Education for 40 plus years, and like federal appellate courts construing similar language, understood the ordinary meaning of the term to be sufficiently broad to include a board of directors. The plaintiffs argue that it needs to be separate entities, two separate entities, that the statute should be read as the educational institution must be controlled by a separate religious organization. There are a number of problems with that, including that the word separate is not in the text. And that violates a fundamental principle of statutory interpretation to insert that term into the text. The plaintiffs never explained why Congress would have intended to include that interpretation or how it would make sense here, which is why the Department of Education expressly rejected it at 85 Fed Reg 59918 and 56. The Department of Education also rejected it because of the significant constitution. Could I bring you to the merits? Sorry, we're going to run out of time and I'd like to ask you about the merits of the claim. So you may have heard me ask about these two versions of the theory. And the one that I find a little bit closer is the second one, where they're saying you have a single sexual conduct policy. And a lot of people are violating it. And the only ones who get kicked out are the same sex couples who are violating it. If that's the allegation, is there a if the disparate treatment being alleged is disparate by enforcement of this policy? Do you have a religious tenant somewhere that says that some of these violations are more serious than others that would explain the disparate treatment? Your Honor, the the community standards do state at age 64 that there are going to be different in enforcement mechanisms, different ways of approaching different types of issues, which, of course, makes sense. I mean, one of the reasons why the decision was made here wasn't just the the nature of the violation, but the fact that both individuals were in permanent unions. And so the fuller expressly noted that it's noted in the complaint that it wouldn't be appropriate to ask these individuals to dissolve their unions. And so they were going to be in permanent violation of the of the regulation of the community standard. And so there's going to be a different way of approaching different types of violations of policy. And they're all going to be consistent with Fuller's theological belief. Is that clear from the face of the complaint, though? I mean, if if your answer is there's a neutral reason, which is how permanent the violation is, can we tell that from from the complaint and the things incorporated in it? Yes, Your Honor. The complaint expressly includes that language and the language, both dismissal letters from from Fuller. Note that reason for the decision here. But taking a step back, Your Honor, using for one thing, the claims here under Title nine still arise under a claim that Fuller Theological Seminary is engaged in sex discrimination and based on sexual orientation. And for that claim to arise, we first need to address Fuller's beliefs on this issue. And Fuller's beliefs are that that that marriage is a covenantal union between one man and one woman. And so, you know, I understand that. But you could let's just take it out of the religious context for a second. So say you're Stanford and they have a policy against plagiarism and they have women plagiarizing and they have men plagiarizing. And they decide to only punish the women. They kick out the women who are plagiarizing. They still have a valid belief against plagiarizing. But if they're enforcing it separately against unfairly between men and women, they might have a Title nine claim. Would you agree the women who were kicked out and not the men? Your Honor, maybe in that case, but not here where the statute doesn't apply to Fuller Theological Seminary. Well, it says it doesn't apply if it conflicts with the religious tenant. So I'm trying to figure out if there's a religious tenant that says that same sex marriage violation of the sexual conduct policy is somehow different from premarital sex violation. If you had a tenant that said that, then it would line up with what happened here. But they're alleging that there's not equal treatment between students. And I'm trying to figure out if there's a religious tenant that supports that. Your Honor, I don't think the allegation is in the complaint, and they didn't raise that as an argument before this court or before the court. What paragraphs 213 and 215 of the complaint are about this disparate treatment of premarital sex compared to the gay marriage students? Your Honor, arising out of this underlying belief regarding the sexual standards and the community standards, which and again, Fuller says at the very beginning of its community standards, that the community standards have to be enforced in a way that can be consistent with policy logical beliefs. And so what this is going to do is inevitably brings us right back to the same question of, can the federal government and a civil plaintiff use civil courts to probe Fuller's religious tenants? It's not just a violation here. It's just the question of whether it's inconsistent, not consistent with those beliefs. And that's why federal courts have been very clear in a variety of different ways. All right. So are you saying that it is it is a more serious violation of the sexual that the religious tenant tells us that it's a more serious violation of the sexual conduct policy to violate it in the same sex marriage part rather than the premarital sex part? No, Your Honor. I'm saying that the in the context of this case, the school clearly explained why it made the decision that it did. And there are no allegations regarding specific situations where someone similarly situated were treated differently. And again, this goes to the point that I was trying to make that federal courts trying to ask the question of what is a the relative harshness of penalties for, quote, similar conduct would require measuring degrees of severity among various violations of church doctrine. That's the Third Circuit and the curate Kramer case, Your Honor, at 450 F. Third, 130, specifically at Penn State, 137. The Third Circuit explained that using doing that kind of inquiry, measuring the relative severity of different types of religious violations and how a religious organization responds to them would itself be a violation of the First Amendment. Is that a Title nine case, though? Sorry, I don't remember that case. So this this particular statute asks us to look at the religious tenants to see if they justify the discrimination. There are other statutes that don't do that. So so in this particular case where you need to be able to point to a religious tenant to get out of Title nine, I think maybe you need to point to a religious tenant. And it sounds like you pointed to a reason that was given. But I don't know if it counts as a religious tenant. Yes, Your Honor, they do count as religious tenants and the religious tenants are reflected in the community standards themselves, which we're in the community standards. Does it say that some violations are more serious than others on this sexual conduct policy? Not on the sexual conduct policy specifically, Your Honor. It's on all of the different standards. And this is on page 64, SCR 64, where the school says that as a theological matter, it's going to approach different violations in different ways. And there will be ways of addressing it that reflect the theological beliefs of the school. And that's exactly what the school did here, where the school said the reason why we're addressing this in this particular situation in this way is because there's not a way to resolve this. So could they have had could they have had no sexual conduct policy at all and just had that vague language you just were talking about about some things are worse than others? And I mean, do they need to express some religious belief to fall under this Title nine exception? Yes, Your Honor. Well, well, let me step back from that. It needs to be not consistent with their religious beliefs. And I think that what the Department of Education has required for over 40 years is an articulation of what that is. And it doesn't require some sort of chapter and birth designation, which, of course, would discriminate against different types of religious bodies that have different ways of formulating their religious beliefs. Here, Fuller has been explicit, has been very clear about what it expects and how it expects religious individuals to comport themselves while they're receiving the ministerial training at the school. And going into this kind of second guessing, Your Honor, going behind Fuller's sincere articulation of its reasons for its action would raise a number of severe constitutional problems, which is why the Department of Education. But if Stanford would be sincere in saying that they're kicking out the women because they're plagiarizing, then I don't quite see how just saying that you have a sexual conduct policy is enough. If you're going to treat people differently who violate the sexual conduct policy, it seems like you might need an additional tenant that explains why you're treating them differently, because that's what Title nine is about. No, Your Honor. And so several reasons. One, Fuller Theological Seminary, which exists solely for the purpose of training men and women for the manifold missions of the Christ and his church. That's what the record shows is different from Stanford, and it changes the way that the federal government interacts with Fuller on these kinds of sensitive religious issues. The Kure Kramer case is an example that of the Third Circuit. The Hall case of the Sixth Circuit says the same thing. This court in Alcazar expressly said that the courts, federal courts, cannot ask the church for a religious justification for its decisions regarding seminarians. That's a six twenty seven after twelve ninety two. And then in this court in the Watchtower decision said that civil courts may not redetermine the correctness of an interpretation or consider whether dismissal was improper under church law. Those cases didn't involve this language of Title nine that requires a religious tenant, right? That's right, Your Honor. But Fuller has put forward its religious tenants, has articulated them here, and they are included in the complaint. The issue that the plaintiffs would have to do here is come behind that and say, well, we think there's a pretext. We think you're not really sincere in saying that there's two problems with that. Once the cases we just talked about that says courts don't get to look behind those justifications in these kinds of contexts. The Watchtower quote, by the way, Your Honor, is that eight nineteen F second in note one. But also, Your Honor, the sincerity of Fuller's religious beliefs here is unquestioned. The plaintiffs admit that in their opening brief at page twenty one. The district court expressly asked them about this and they and the plaintiffs at oral argument at ER thirty one through thirty three. And the plaintiffs said they're not asking the court to question Fuller's religious sincerity as it regards marriage. And they're not going to attack the sincerity of the justifications for what Fuller did, even at the summary judgment stage. And so the plaintiffs have properly recognized that they can't go behind Fuller's sincere statement of its beliefs and ask this court or another court to substitute its judgment for what those beliefs are and how those should those beliefs should be addressed in the sensitive context of ministerial training. That's what we're talking about here. We're talking about ministerial training. These are students that came to the School of Theology at Fuller Theological Seminary to get theology degrees as a part of their desire to engage in ministry. Part of the reason why the Alcazar case of these kind of situations are off limits for courts to resolve at all. And in this context, I think the our lady decision from the US Supreme Court also speaks to it. It says that state interference in matters of faith and doctrine obviously violates the free exercise clause. And any attempt by the government to dictate or even to influence those matters would be an equal violation. The Establishment Clause is at 140 Supreme Court twenty sixty. And this goes to part of what happened in the Hosanna Tabor case was talking about these sort of issues were not a spending clause. Those aren't spending clause decisions. So we again, we have this particular language in this spending. It's like a conditional. I mean, it's an exception to this. The spending grant that the conditions on the spending grant that says if it violates a religious tenant. So it's just a particular carve out that seems not to exist in the general ADA or Title seven applies to everyone kind of thing. Yes, your honor. And this court and other courts have addressed issues where there have been spending clause related issues. So, for instance, the worst decision by this court dealt with the Rehabilitation Act and the applicability of the religion clauses to borrow a claim under the Rehabilitation Act. In that context, the the the several other cases have reached the same result in determining that just because there's a spending clause component doesn't mean that the that the religion clauses don't apply. The government can't buy its way to entangle itself with religion. Your honor, just to talk briefly about the amendment issue. The only argument for amendment that plaintiffs made in their opening brief is that is a per se violation of use of discretion for the to dismiss the plaintiff's amended complaint without giving them the opportunity to amend. The plaintiff's never asked for an opportunity to amend. And this court has long repeatedly rejected the idea that just because you don't give leave to amend that it's a per se abuse of discretion. That's at Roth 942 second 628 and also Rodriguez 215 after 1333. And so and that's particularly true. The abuse of discretion standards are particularly strong and broad where the plaintiff has previously amended, which is what the plaintiffs did here. They had the opportunity to previously amend and they did not cure any of these deficiencies, all of which arise out of their claim that Fuller Theological Seminary violated Title 9 by dismissing students because they were in same sex marriages. When they haven't identified the kinds of arguments that the court that you are, Judge Friedland, that that abuse of discretion standards particularly high. This court is particularly noted that in the case 682 F3 at 846 and the Salama case 9 726 F3 at 1133 that they have a responsibility to identify it when they don't. That increases the burden they have to surmount. So for these reasons, your honors, we respectfully request that you would affirm the district court. OK, thank you very much. We'll hear from rebuttal. In response, your honor, when when analyzing the denial or dismissal, this court is at the DeNovo review for our rule 12 B6 dismissals. And so we're just looking even at plaintiff's first amended complaint. In addition to the disparate treatment allegations, I'd point this court's attention to the excerpt of record 64, where Fuller describes its disciplinary procedures and saying that disciplinary procedures are always to be viewed as a last resort. Plaintiffs incorporate that language in paragraphs 193 and 254 of their first amended complaint. And they further allege a paragraph 255 that Fuller used disciplinary measures as the first and only resort in dealing with perceived violations by Joanna and Nathan. And so, again, that supplements the argument that they are being treated differently than Fuller tells its students. Fuller tells its students that all students that disciplinary measures should be a last resort. Fuller also says that disciplinary measures should be made in in the context of supporting stable family life. And the allegations in the complaint show that Joanna is a mother and that Joanna also was very near the completion of her degree program. And so I think that these allegations supplement the allegations of disparate treatment and demonstrate that the district court's dismissal of the first amended complaint should be reversed. And at the very least, these claims should be allowed to proceed through discovery. Thank you for your arguments this morning. We appreciate them very much. That ends our session for today. The case is submitted. Bye now. Thank you, Your Honor. Take care. Thank you. All rise.
judges: PAEZ, WATFORD, FRIEDLAND